**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**VALERIE DENECE HARRIS**                                    **PLAINTIFF**

**VS.**                                    **CIVIL ACTION NO. 3:17-CV-291-CWR-LRA**

**NOXUBEE COUNTY, MISSISSIPPI**
**and BETTY S. ROBINSON**                                    **DEFENDANTS**

## DEFENDANTS NOXUBEE COUNTY AND BETTY ROBINSON'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants Noxubee County and Betty Robinson and file this, their Motion for Summary Judgment, and in support thereof would show unto this Court as follows:

## INTRODUCTION

Valerie Harris filed this First Amendment retaliation claim alleging she was fired because she refused to sign a confidentiality form. Plaintiff Harris pleads she was "fearful" of signing the form because it "required her to conceal information she was lawfully required to disclose." Plaintiff Harris admits all of this "information" amounted to matters Plaintiff Harris would have spoken on as a part of her official duties. As such, under *Garcetti*, Plaintiff has no First Amendment protection. Plaintiff Harris' First Amendment claims also fail when none of the "speech" at issue involves a matter of public concern. Additionally, Plaintiff Harris was a confidential employee, and Plaintiff Harris would have been fired anyway for her behavior at work. For all of these reasons, it is respectfully submitted summary judgment is warranted for Defendants Noxubee County and Betty Robinson.

## Statement of Undisputed Facts

On November 3, 2015, Defendant Betty Robinson was elected Tax Collector/Assessor of Noxubee County, Mississippi. In Noxubee County, the Tax Assessor's Office has both a

collection side and an assessment side. (See Robinson Deposition attached as Exhibit "B" at p. 8-10). Plaintiff Valerie Harris worked in Ms. Robinson's office in both collection and assessment as an appointed deputy clerk. The collector's side of the office is charged with collecting taxes while the assessor's side of the office is taxed with appraising or assessing property in the county for purposes of establishing taxation. *Id*. Robinson oversees six deputy clerks who work in her office. *Id*.

*Miss. Code Ann*. § 27-1-23 grants the deputy assessor-collector as much access as the elected Tax Assessor-Collector to "inspect books and accounts, papers, memoranda and records" and "make an estimate of the value of all property to be assessed" and to ask questions of the owner to determine the actual cash value of any property. The assessor and her deputy assessors may also inquire about the insurance of said property and, if they have reason to believe any information given by the taxpayer is "incomplete or incorrect" or if property has been "undervalued," the deputy or the assessor shall assess the same and add it to the assessment roll at its "true value." *Id*.

The Tax Collector-Assessor also has the authority to investigate, inquire and use their own judgment to assess the true value of the electorate's property. *Miss. Code Ann*. § 27-1-23. In all of these tasks, the deputy may stand in for elected Tax Assessor-Collector.

Noxubee County's elected Tax Collector-Assessor, like all other Mississippi Collector-Assessors, may appoint deputies to help him/her fulfill the role of this elected position and these appointed deputies must give a bond for the faithful discharge of their duties. For deputy assessors, *Miss. Code Ann*. § 27-1-3 establishes that the elected Tax Collector-Assessor may appoint deputies, who "shall take the oath of office, and shall be required by the assessor to give

bond to him in an amount not less than Ten Thousand Dollars ($10,000.00) for the faithful discharge of their duties." *Miss. Code Ann*. § 27-1-9 establishes the Tax Collector-Assessor may appoint a sufficient number of deputy collectors "to assist him in carrying out the duties of his office"; each deputy tax collector must give a bond of not less than $50,000.00.

Plaintiff Harris admitted in her deposition, as a deputy assessor/collector clerk, she was charged with overseeing the collection of hundreds of thousands of dollars in tax payer monies:

| Page/Line | Plaintiff Valerie Harris Deposition |
|---|---|
| 14, 3 | Pretty important job that you had?  **I think so.**  A lot of the information that you gathered affected people's bottom lines?  **Yes, ma'am.**  Ultimately, is the elected tax assessor/collector responsible, for the office and her deputies' work?  **I would think she's ultimately, yeah, I would say she is ultimately.**  What about collector?  What did you work on the collector side?  **I have, yes, ma'am.**  What would the deputy tax collector do?  **Well basically I would only, accept checks majority of the times.  I did have a little portable drawer if I had to work over there, had to fill in for someone.  Just basically collect taxes on personal, mobile home, just the taxes.  Sometimes I would collect motor vehicles, when people came to purchase their tags.** |
| 16,1 | Would you say the tax collector/assessor within the county probably handles the most money in county business?  **Oh, sure, yes, ma'am.**  How much money would come through the office yearly?  Thousands?  **Yes for sure.  At least 5-, $600,000, I would say, in a year.** |

(See Harris Deposition attached as Exhibit "A").

A year following her election as Tax Collector/Assessor, Defendant Robinson asked employees to sign what she referred to as a Confidentiality Agreement. (See Doc. 1, Complaint at P.2, ¶5). The Agreement states in pertinent part:

"Please be reminded that discussing any matters concerning the business or conduction of business in the Noxubee County Tax Assessor/Collector's Office is strictly prohibited. This includes but is not limited to employee and employer meetings. Failure to adhere is grounds for immediate termination."
(See Doc. 1-1, Confidentiality Agreement (attached as Exhibit "A" to Doc. 1, Complaint)).

On or about November 17, 2016, Ms. Robinson presented the Confidentiality Agreement to all employees of the Tax Collector/Assessor's Office, including employee and now Plaintiff Harris. (See Doc. 1, Complaint at P.2, ¶5).  Harris refused to sign the Confidentiality Agreement in November and again in January 2017 because:

> **Plaintiff was fearful of signing the form because she believed it required her to conceal information which she was lawfully required to disclose.  For example, customers often ask for advice about such matters as to when taxes are due or when one should go to pay taxes, arrangement for taxes, and other routine business.  These matters are of public record, and plaintiff believes she was to disclose them.  Further, plaintiff had witnessed a $12,000 shortage in the office, and plaintiff believed that such matter would be of strong public interest, such that she may be lawfully required to disclose them.  Further, the Mississippi Public Record Act generally makes public records accessible to the public. (See Doc. 1, Complaint at P.2, ¶6.)**

At her deposition, Plaintiff Robinson confirmed her reasons for not signing:

| Page/Line | Plaintiff Valerie Harris Deposition |
|---|---|
| 29,5 | Ms. Harris, I'm going to show you what has been marked as Exhibit 2.  This is the Complaint that your attorney filed in this lawsuit.  Are you familiar with this document?  **Yes, ma'am.** Did you review this document before he signed it and filed it on your behalf?  **Yes, ma'am.**  Let's look at paragraph 6 of the Complaint.  I'm going to ask you to read over paragraph 6 for me if you could.  **Certainly - -** You can read it out loud into the record.  That would be fine. |
| 29,19 | **Plaintiff was fearful of signing the form because she believed it required her to conceal information which she was lawfully required to disclose.  For example, customers often ask for advice about such matters as to when taxes are due or when one should go to pay taxes, arrangement for taxes,** P30/L1 **and other routine business.  These matters are of public record,** |

**and plaintiff believes she was to disclose them. Further, plaintiff had witnessed a $12,000 shortage in the office, and plaintiff believed that such matter would be of strong public interest, such that she may be lawfully required to disclose them. Further, the Mississippi Public Record Act generally makes public records accessible to the public.**

30,12      Is that a true and correct statement of what you were afraid of disclosing in this case? **Yes.**

MR. McLAUGHLIN: Object to form.

MS. JACKS: You can answer.

Mr. McLAUGHLIN: You can answer the question.

30,21      **Yes, ma'am.**

30,23      Is there anything else that you would add to that today that were additional things that you were scared that you wouldn't be able to disclose per this Exhibit 1?

31,2      **Sure. I mean, just anything that is of public information out of the office. We had taken a sworn oath to say that we would serve the people with integrity, and I just thought that this would hinder me from signing. I mean, not just this, just what will come or what I would be bound to not to share even in the future.** Sure. A part of anything that was part of your official duty as a deputy tax assessor and collector, you wanted to be able to share? **Yes, ma'am.** That was all that you wanted, right? **Yes, ma'am.**

(See Robinson Deposition attached as Exhibit "B").

For her part, Defendant Robinson initiated the Confidentiality Agreement because she believed employees in her office were gossiping about employer/employee meetings outside of the office and she wanted to curtail such gossip:

**Page/Line**      **Betty Robinson Deposition**

30,1      I'm showing you an agreement on letterhead of the office of the Noxubee County tax assessor/collector that's been marked as

Exhibit 1 to your deposition. Who drafted that? **I did.** Did you do it on your computer at your office? **Yes.** Why did you draft this? **Because I had been hearing someone had come to me and told me that they was discussing some things that we had talked about, and I thought I need to get it under control, that what we discuss in a meeting did not need to be discussed outside of the office.**

30,16 Who came to you and said that someone had been talking about what happened in a meeting? **Do I have to answer that?** That is up to your lawyer. That's the question I'm asking.

MS. JACKS: Unless it's an attorney/client privilege that you might have had with an attorney, you do have to answer.

31,1 **Okay. Ms. Essie Brooks.** Essie Brooks? **Yes.** What did Essie Brooks tell you? **Actually Valerie and I are family. Sad to say. She came to me and told me that Valerie had talked to her daughter and her daughter had come to her. She asked me what was the problem with Valerie and I. I said I didn't have a problem with her. She had told her cousin that I was picking on her in a meeting.** Valerie told someone, Betty is picking on me? **Uh-huh.** And it got back to you? **Yes, sir.** Is that why you drafted what is Exhibit 1? **Yes.** Are there any other reasons?

32,1 **She had also got on to the other - - she had talked to her mom, and her mom had talked to Tina mom. It just started spreading, and that is why I thought I should get it under control. Because actually, now, we are family. She might not want me to say that. We are family, distant family. In Noxubee County, we have a close relationship with the Stewart family. I would say, and she's part of that family.**

32,13 What relation are you to Valerie? **We're distant cousins.** Is there any other reason other than what you heard Valerie had been saying out of the office, other than that, are there reasons that you drafted Exhibit 1? **Yes sir.** Tell me all the reasons. **Oh, no, I didn't understand you. That was the main reason it was starting to spread.** Valerie talking? **Yeah.**

(See Robinson Deposition attached as Exhibit "B").

6

All of the other clerks signed the Confidentiality Agreement except Plaintiff Harris. Deputy Clerk Shumeka Dooley testified she had no problem signing the agreement as she understood it to address what was said by Ms. Robinson in employer/employee meetings:

| Page, Line | Shumeka Boswell Dooley Deposition |
|---|---|
| 12,25 | Did you have any apprehension about signing this document. **I didn't. No.** |
| 13,3 | Fine with you not to talk about work? **They said the question, what she stated for us not to talk about was not to talk about what go on in the meetings. I didn't have an issue with that.** |
| 13,8 | Did you read this agreement before you signed it? **I did.** It applies to more than meetings, doesn't it? |

MS. JACKS: Object to the form. You can answer.

| | |
|---|---|
| 13,15 | **You say it applies to more than meetings?** Doesn't it? **No.** Does it say, please be reminded that discussing any matters concerning the business or conduct of business of the Noxubee County Tax assessor/collector's office is strictly prohibited? Does it say that? |
| P14/L1 | **It say that. Also, at the same time Ms. Betty explained what she wanted us to not to discuss.** |
| 14,4 | She said it was just what happens in meetings? **She said that meetings, pertain to the meetings, and going out badmouthing her and downing her. That's what the whole thing was.** |
| 14,8 | Was that her concern, that somebody might be badmouthing her? **I think she had heard something, that someone she say that Valerie told someone. I'm not sure about it.** Did she specifically say that she had heard people badmouthing her? **Yes she did. Someone came and told her.** She wanted to stop the deputy clerks from badmouthing her by getting them to sign this? **Signing that, and basically, like I say, no discussing what goes on in the meetings.** |

**(Deposition of Shumeka Boswell Dooley attached as Exhibit "C").**

Following Valerie Harris' refusal to sign the Confidentiality Agreement, she was terminated by Betty Robinson. On April 21, 2017, Harris filed the instant lawsuit alleging a First Amendment retaliation claim. In the Complaint, Harris alleges she was fired in violation of her First Amendment rights when she refused to sign the Confidentiality Agreement at issue.

## Law and Argument

## <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant has the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant makes such a showing, the burden then shifts to the non-movant to "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. Before finding that no genuine issue for trial exists, the court must first be satisfied that no rational trier of fact could find for the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**I.    Plaintiff Harris' Allegedly Curtailed Speech Would Have Been Made Pursuant to Her Official Duties and not as a Private Citizen Affording Harris no First Amendment Protection.**

The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. See, e.g., *Pickering v. Board of Ed. Of Tp. High School Dist. 205, Will County, Illinois*, 88 S.Ct. 1731 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315

(1987); *United States v. Treasury Employees*, 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

Here, none of Ms. Harris' allegedly curtailed speech would be speech made as a private citizen. Harris admits all of the speech would be made as an official. As such, Ms. Harris is afforded no First Amendment protection. It is respectfully submitted her claims should be dismissed and summary judgment be granted to Noxubee County and Betty Robinson.

When analyzing First Amendment workplace speech cases, two inquiries guide interpretation of the constitutional protections accorded to public employee speech. First, courts must determine whether the employee spoke as a citizen on a matter of public concern. *Pickering v. Board of Ed. Of Tp. High School Dist. 205, Will County, Illinois*, 88 S.Ct. 1731. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. See *Connick v. Myers*, 461 U.S. at 147. If the answer is yes, then the possibility of a First Amendment claim arises. *Id*. Then, the question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. See *Pickering v. Board of Ed. Of Tp. High School Dist. 205, Will County, Illinois* , 391 U.S. at 568, 88 S.Ct. 1731.

In the case at bar, Ms. Harris' complaints regarding her silenced speech were, by her own admission and allegations, speech to be made as a part of her official duties. Harris is not and was not concerned about speaking as a private citizen. Because Ms. Harris was only concerned about speech to be made as a part of her official duties, the present First Amendment inquiry should start and end there with dismissal of the instant claims.

The private citizen versus employee speech analysis was clarified in *Garcetti v. Ceballos*. What *Garcetti* teaches is in the First Amendment context, the threshold consideration is whether the speech at issue is being made as a private citizen or as an official. If the speaker is commenting as an official, there is no First Amendment protection. 457 U.S. 410, 421 (2006).

Under *Garcetti,* then, "before asking whether the subject-matter of particular speech is a topic of public concern, [courts] must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job." *Davis v. McKinney,* 518 F.3d 304, 312 (quoting *Mills v. City of Evansville,* 452 F.3d 646, 647–48 (7th Cir.2006)). For this initial inquiry, a court's focus is not on the speech's content, but rather "the role the speaker occupied when [s]he said it." *Id.* Additionally, to determine whether speech was made pursuant to an individual's official duties, courts review a number of factors, including the internal versus external nature of the speech, the employee's formal job description, whether the employee spoke on the subject matter of his or her employment, and whether the speech resulted from special knowledge gained as an employee. *Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d at 692; *Davis v. McKinney,* 518 F.3d at 313; *Charles v. Grief,* 522 F.3d 508, 513 (5th Cir.2008). No one factor alone is dispositive. *Johnson v. Hurtt*, 893 F. Supp. 2d 817, 829 (S.D. Tex. 2012)

In sum, the Supreme Court has found while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick*, 461 U.S., at 154, 103 S.Ct. 1684. *Garcetti v. Ceballos*, 547 U.S. at 417–20, 126 S. Ct. at 1957–59, 164 L. Ed. 2d 689 (2006).

In this case, by her own admission and pleadings, Ms. Harris' "speech" was to be made as an official.

In *Johnson v. Hurtt*, a Texas district court was faced with a similar allegation to the allegations in the case at bar. 893 F. Supp.2d 817 (S.D. Tex. 2012). In *Hurtt*, the plaintiff Joslyn Johnson alleged City policies violated her First Amendment rights because the policies prevented her from communicating with ICE officials as a City of Houston Police Officer. *Id*. at 824-25. In that case, the *Hurtt* court found the speech employee Johnson was worried she could not make under City of Houston guidelines was all speech Johnson would make pursuant to her duties. *Id*. at 832. As such, Johnson was afforded no First Amendment protection. *Id*. at 835.

In *Hurtt*, Johnson's Second Amended Complaint listed the speech she was worried would be silenced; the court found Johnson's own allegations demonstrated her desired communications would be made pursuant to her official job duties as a law enforcement officer; therefore, it was speech unprotected under the First Amendment. *Id*. at 832. Citing *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), *Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689 (5th Cir.2007), *and Nixon v. City of Houston,* 511 F.3d 494 (5th Cir.2007), the *Hurtt* court found plaintiff Johnson's allegations did not state a First Amendment violation. *Id*. at 835.

In reaching this conclusion, the Texas district court analyzed three important First Amendment employment speech cases – *Garcetti, Williams and Nixon* – all of which are instructive in the case at bar.

In *Garcetti,* the deputy district attorney for the Los Angeles County District Attorney's office drafted a memorandum to his supervisors highlighting his concerns over inaccuracies in an affidavit used to procure a warrant. 547 U.S. at 414. *Id*. The attorney's memo suggested the office refrain from prosecuting the case for which the warrant was obtained. *Id*. After writing the

memo, the deputy was subjected to a series of retaliatory events. *Id*. The attorney brought a First Amendment retaliation claim contending that the employment events were a direct response to his memoranda. The Supreme Court found that the deputy's statements in the memoranda were not protected speech because they were made "pursuant to his duties as a calendar deputy," specifically, the fulfillment of his "responsibility to advise his supervisor about how best to proceed with a pending case." *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951. The Court reasoned that " '[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22, 126 S.Ct. 1951.

In *Williams,* the Fifth Circuit analyzed *Garcetti* and determined that its holding, at minimum, demonstrates that "[j]ob required speech is not protected." *Williams,* 480 F.3d at 693. The Fifth Circuit went on, however, to "determine the extent to which, under *Garcetti,* a public employee is protected by the First Amendment if his speech is not necessarily required by his job duties but nevertheless related to his job duties." *Id.* In *Williams,* a highly school athletic director was removed from his position after he wrote several memoranda to high-ranking school officials, including the principal, calling into question the school's handling of its athletic fund. Although the memoranda were not required as part of Williams's job duties, the Fifth Circuit nevertheless found that Williams wrote the memoranda in the course of performing his job because he needed accounting information from the school principal and office manager so that Williams could perform his duties as Athletic Director. *Id.* at 694.

Finally, in *Nixon,* the Fifth Circuit held that an HPD Patrol Officer's statements to the media concerning a high speed car chase, which resulted in an accident, were not protected "because they were made pursuant to his official duties and during the course of performing his job." *Nixon,* 511 F.3d at 498. Relying on *Garcetti* and *Williams,* the Fifth Circuit reasoned that the Officer's statements were not protected because they were made to the media while on duty, in uniform, and while working at the scene of the accident. *Id.* at 499.

In the *Hurtt* case, the court found plaintiff's allegations referenced her professional judgment, her duties and responsibilities as a law enforcement officer, her oath to faithfully execute such duties and responsibilities, and her ability to contact ICE in her capacity as a law enforcement officer while "out on the street," during the course of carrying out her daily duties, and during legal detentions of those she lawfully encounters. Thus, the *Hurtt* court found, by plaintiff's own pleadings, it was clear her desired communications with ICE would necessarily owe their existence to her professional responsibilities as a law enforcement officer and that they would be made in the course of performing her official duties as a law enforcement officer. *See Garcetti,* 547 U.S. at 421–22, 126 S.Ct. 1951; *Williams,* 480 F.3d at 694; *Nixon,* 511 F.3d at 499. *Johnson v. Hurtt*, 893 F. Supp. 2d 817, 831–33 (S.D. Tex. 2012)

The case at bar is just like *Hurtt* and so should be the result.

Here, Plaintiff Harris has plead and confirmed in her deposition the matters she believed to be silenced by the Confidentiality Agreement were all matters she wished to speak about as a part of her role and official duties as deputy tax collector. Indeed, Ms. Harris testified she feared the agreement silenced her on the following topics:

1.      Answering questions about taxes owed

2.      Fulfilling public records requests

3.      Answering questions about missing funds in the Tax Assessor-Collector's Office

Harris further stated all of these matters, and any other matters she was concerned with, would be spoken about pursuant to her official duties.

Indeed, it is axiomatic Plaintiff Harris, as a part of her official duties as deputy tax collector would be called upon to answer questions about how much is owed in taxes. Likewise, it would only be a part of her official duties that Harris would be asked to answer a public records request. Finally, Harris vaguely alleges "missing" money in the Tax Collector's office, but again, Ms. Harris acknowledges any speech she would make concerning such alleged "missing money" would be made pursuant to her "official duties" as deputy tax collector and not as a private citizen.

| 30,23 | Is there anything else that you would add to that today that were additional things that you were scared that you wouldn't be able to disclose per this Exhibit 1? |
| 31,2 | **Sure.  I mean, just anything that is of public information out of the office.  We had taken a sworn oath to say that we would serve the people with integrity, and I just thought that this would hinder me from signing.  I mean, not just this, just what will come or what I would be bound to not to share even in the future.**  Sure.  A part of anything that was part of your official duty as a deputy tax assessor and collector, you wanted to be able to share? **Yes, ma'am.**  That was all that you wanted, right?  **Yes, ma'am.** |

(See Robinson Deposition attached as Exhibit "B").

Under *Garcetti,* the threshold inquiry in employee First Amendment cases is whether the speaker is speaking as a private citizen or as a part of his/her official duties. Here, by Plaintiff

Harris' own pleadings and deposition testimony, the answer is plainly the alleged restrained speech would be speech made by Harris pursuant to her official duties. Under *Garcetti*, the speech then is afforded no First Amendment protection. For this reason, it is respectfully submitted Plaintiff Harris' claims should be dismissed.

## II. Even if Plaintiff Harris Could Show She was Speaking as a Private Citizen, Harris has not Alleged any Speech Allegedly Curtailed was a Matter of Public Concern.

If an individual's speech is determined to have been spoken "as a citizen," then the next inquiry is whether the individual's speech is on a matter of public concern. "Matters of public concern are those which can 'be fairly considered as relating to any matter of political, social, or other concern to the community.' " *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir.2001) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

Again, Plaintiff Harris' three areas of content she believed were silenced by the Confidentiality Agreement were:

1. Answering questions about taxes owed

2. Fulfilling public records requests

3. Answering questions about missing funds in the Tax Assessor-Collector's Office

Answering individual questions about taxes and complying with public records requests are not matters of concern to the community at large. As for the alleged "missing" money, Plaintiff Harris offers no proof any money was missing or that there was an investigation by any level of government or law enforcement agency concerning "missing money." This vague allegation does not amount to an area relating to any matter of political, social, or other concern to the community. Further, Harris has not demonstrated by any witness or document there was

any actual issue or controversy related to the alleged missing money. For this additional reason, that the speech at issue did not involve a matter of public concern, summary judgment is appropriate for Betty Robinson and Noxubee County.

**III.   Alternatively, Even Under a Balancing Test, Plaintiff Harris' Interest in the Alleged Curtailed Speech is Outweighed by Defendant Robinson's Right to a Loyal Staff; Accordingly, the Balance of Interests Tips in Favor of Allowing the Tax Collector/Assessor's Confidentiality Agreement.**

If an individual's speech is determined to have been spoken as a "citizen" on a "matter of public concern," then the final task is to "determine[ ] whether the interest of the government employer 'in promoting the efficiency of the public services it performs through its employees' outweighs the employee's interests, as a citizen, 'in commenting upon matters of public concern.' " *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir.2007) (quoting *Pickering*, 391 U.S. 563, 568, 88 S.Ct. 1731). *Johnson v. Hurtt*, 893 F. Supp. 2d 817, 829 (S.D. Tex. 2012).

An employer bears the burden of establishing that its interest in promoting efficiency outweighs the employee's interest in making protected speech. *Vojvodich v. Lopez*, 48 F.3d 879 (5th Cir. 1995).   In the analysis, the Court employs a "sliding scale" to weigh public concern against the level of disruption.  *See Click v. Copeland*, 970 F.2d 106, 112 (5th Cir. 1992).  Among the factors which the Court should consider in evaluating this prong are:

1)   the degree to which the speech involved a matter of public concern, and the gravity of that concern;

2)   the extent to which the speech disrupted necessary close working relationships;

3)   the time, place and manner of the speech; and

4)   the context in which the speech was made.

*Connick v. Myers*, 461 U.S. 138, 151-153 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

Here, assuming only for sake of argument that Harris' alleged curtailed speech would be made as a (1) private citizen and (2) on a matter of public concern, Harris' claims should still be dismissed because the interest of Betty Robinson in promoting the efficiency of her office and other factors outweigh any interest in the "speech" to be made by Harris.

In fact, as recently as 2017, a court in the Northern District of Mississippi analyzed a First Amendment case in the context of a Tax Assessor/Collector's termination of a deputy clerk. In this case, Judge Biggers found that because of the unique nature of the Mississippi Tax Assessor/Collector's office (small intimate office staff, handling of large amount of funds, shared duties between deputy and elected official), under the *Pickering* analysis, the balance of interests weighed heavily in favor of the Tax Assessor and not the employee. This Mississippi court found, with regard to First Amendment protection, the employee's political speech was not protected. *Foster v. Harris*, Cause No. 3:16CV091-NBB-JMV (Northern District of Mississippi July 7, 2017).

In *Foster v. Harris*, Carol Foster was a deputy tax collector in Quitman County, Mississippi. *Id*. at p. 1. In *Foster*, Ms. Foster alleged she was fired as deputy tax collector following Alice Smith's November 2015 election as County Tax Collector/Assessor. *Id*. Ms. Foster alleged Ms. Smith terminated her from the deputy clerk position immediately following the election because Foster openly supported Smith's opponent in the Tax Collector/Assessor's race. *Id.*

In granting both Alice Smith and Quitman County summary judgment, Judge Biggers noted a Tax Assessor/Collector in Mississippi is charged with collecting and handling of significant amounts of taxpayer money and with the assessment and valuation of property within the county. *Miss. Code Ann*. §§ 21-1-7, -19, -23. *Id.* at p.8. Judge Biggers also cited Section 27-1-3 of the Mississippi Code which provides the elected tax assessor/collector may appoint deputy assessors who "shall take the oath of office and shall be required by the assessor to give bond to him in an amount not less than Ten Thousand Dollars ($10,000.00) for the faithful discharge of their duties." *Id.* Further, found Judge Biggers, Section 27-1-9 provides that the tax collector may appoint deputies "to assist him in carrying out the duties of his office," with each deputy tax collector to give a bond of not less than $50,000.00. *Id.*

Judge Biggers noted the Mississippi Code grants tax assessor/collectors as well as their deputies the power to, inter alia, "inspect books and accounts, papers, memoranda, and records" and to "make an estimate of the value of all property to be assessed." *Miss. Code Ann*. § 27-1-23. *Id.* Judge Biggers also found in addition to handling large sums of taxpayer funds, the tax assessor/collector and her deputies have the authority to investigate, inquire, and employ their own judgment to assess the true value of the electorate's property and Mississippi law affords a deputy tax assessor/collector as much access and power as the elected tax assessor/collector. *Id.*

Judge Biggers cited *Stegmaier,* an Alabama case, involving the termination of a deputy clerk in the circuit clerk's office. *Stegmaier v. Trammell*, 597 F.2d 1027. In *Stegmaier,* the court found that because the circuit clerk's duties involved the handling of public funds, the electorate presumably chooses a circuit clerk based on his or her reputation for honesty and integrity. *Stegmaier*, 597 F.2d at 1040. In *Stegmaier,* the allegation was the newly elected circuit clerk

18

terminated a deputy clerk following her election because of the deputy's support of another candidate. The *Stegmaier* court found no First Amendment protection for the terminated employee because (1) the electorate would expect the elected official to choose deputies who will assist him or her in fulfilling the duties of the office with honesty and integrity; (2) under Alabama law, the deputy clerk, appointed by the circuit clerk, may perform all of the elected circuit clerk's statutorily prescribed duties, and (3) the circuit clerk may be held responsible for any failure or shortcomings in the execution of those duties. *Id.* at pp. 8-9.

Judge Biggers found the *Stegmaier* analysis useful in *Foster* because in Mississippi, deputy tax assessors may perform all of the elected tax assessor/collector's statutorily prescribed duties. *See* Miss. Code Ann. § 27-1-23. *Foster v. Harris*, Cause No. 3:16CV091-NBB-JMV (Northern District of Mississippi July 7, 2017). In *Stegmaier* the court found an elected circuit clerk should be afforded the opportunity to appoint a deputy in whom he has total trust and confidence and from whom he can expect "undivided loyalty." Judge Biggers found the same opportunity should be given to elected Tax Assessor-Collectors in Mississippi. *Id*. at p. 9.

In *Foster*, Judge Biggers found Foster's campaigning for Smith's opponent was arguably, at least to some degree, a matter of public concern. *Id.* Finding speech made as a private citizen on a matter of public concern, Judge Biggers then performed a balancing test and utilizing *Stegmaier* and other cases found employee Foster on the low end of the First Amendment speech protection spectrum. *Id.* at pp. 9-13.

In making this determination, Judge Biggers found the Quitman County Tax Assessor/Collector's office is a small one, with only a handful of deputy assessors and collectors. *Id.* at p. 9-10. Judge Biggers found a small office with few employees naturally

amplifies any awkwardness or discord among the employees, or in this case, between an employee and her boss. *Id.* at p. 10. Judge Biggers went on to find that "it is clear that close and confidential working relationships are essential in the Quitman County Tax Assessor/Collector's office and that the deputy assessor qualifies as a "confidential employee" for more reasons than the small size of the office." *Id.* Judge Biggers specifically noted the "particular public responsibility being carried out," involves, among other things, the handling of large amounts of taxpayer monies and the valuation and assessment of taxpayer property. *Id.* Like the court in *Stegmaier*, Judge Biggers found the elected official here should be afforded the opportunity to appoint a deputy in whom she has complete trust and confidence and from whom she can expect undivided loyalty. *Id.*

Judge Biggers also noted that openly supporting an employer's opponent, even if accomplished outside the office, could be and would be considered by most employers "insubordinate" or "hostile" behavior toward that employer – behavior which the Fifth Circuit recognized could cause disruption in the workplace. *Id.* at p. 11 Citing *McBee v. Jim Hogg County*, 730 F.2d 1009, 1017 (quoting *Connick*, 461 U.S. at 152). The *Foster* court found such circumstances do not "promot[e] the efficiency of the public services [the defendant] performs through [her] employees." *Id.* Citing *Pickering*, 391 U.S. at 568. In sum, Judge Biggers found Foster's activities "sufficiently disrupted the working relationship [between Foster and Smith] as to prevent effective performance" of the duties of the Quitman County Tax Assessor/Collector's office. *Id.*

Finally, citing *Gentry v. Lowndes County,* Judge Biggers found, the duties required of the positions at issue here "strongly influence the public's view of the elected [official]," and the

plaintiff's confidential position would allow her to advance Smith's policies, if she were to act faithfully, "or to undermine those policies by overt or covert opposition," if she were so inclined. *Id.* Citing *Gentry*, 337 F.3d 481, 483 (5th Cir. 2003). The *Foster* court therefore found that "[b]ecause [the plaintiff's] political activities created strains that could easily disrupt and prevent the effective performance of public services, the government interest must take precedence over those activities." *Id.* Judge Biggers found working under defendant Smith, Foster would "clearly be in a position of trust and confidence, and this position limits her right to engage in political activity against her superior."

In the end, Judge Biggers found Carol Foster a "confidential employee" as that term applies to free speech and political affiliation jurisprudence and further found the balancing test set forth above weighs in favor of the defendant, placing the plaintiff on the "low protection end" of the free speech and political affiliation "spectrum." *Id.* at p. 12. Accordingly, the *Foster* court found that the plaintiff has suffered no actionable First Amendment violation. *Id.*

*Foster* may and should guide this Court's analysis of the case at bar. While Foster involved political speech, just like *Foster*, this case involves the termination of a deputy clerk in the Tax Assessor's office for an alleged First Amendment violation. In *Foster* the "speech" was political speech; here, the "speech" was a Confidentiality Agreement designed to keep employees from gossiping about Ms. Robinson's employer/employee meetings outside the office.

As was the case in *Foster*, the Tax Collector-Assessor's office in Noxubee County is elected and the Collector-Assessor should be allowed to hire and keep staff who will be loyal to her. Just as in *Foster*, the Noxubee Collector-Assessor's office is charged with handling

hundreds of thousands of dollars in tax payer money; if any of Ms. Robinson's clerks wanted to sabotage the office, they could certainly attempt to do so by alleging funds to go missing or by alleging "missing funds." In fact, Ms. Harris is attempting just such an allegation in this lawsuit.

Further, like the office in *Foster*, the office in this case is a small one, with only 6 full-time clerks. In fact, Ms. Robinson was hoping to temper discord by telling employees she did not want them gossiping outside the office about employer/employee reactions.  Of course, just like it would in *Foster*, discord would be evident and disrupt the working conditions of the Noxubee Collector-Assessor's department.

Finally, all the Court has before it are vague allegations of what speech might have been made regarding public records, tax information and alleged missing funds. Again, handing out public records and tax information to citizens is an official function of the office. The vague missing money allegation is difficult to analyze because Plaintiff Harris offers no information concerning the allegation, when and where she believed she would be asked to comment on the money, who took the money, who was investigating the money or any facts about the money. As such, these factors - the context of the speech and the time, place and manner of the speech-weigh in Ms. Robinson's favor.

In sum, based on all of these factors, just like Ms. Foster, Plaintiff Harris should be considered a confidential employee of the Tax Assessor-Collector's office putting her, just like Ms. Foster, on the low end of the spectrum of First Amendment protection and making summary judgment appropriate for Noxubee County and Betty Robinson.

### IV. Harris Would Have Been Fired Anyway, Regardless of the Confidentiality Agreement.

Finally, the proof shows Ms. Robinson would have fired Ms. Harris anyway, regardless of her failure to sign the Confidentiality Agreement. For this additional reason, summary judgment is appropriate.

| Page/Line | | Betty Robinson Deposition |
|---|---|---|
| 20 | 2 | Are you familiar with her job performance while she was your co-worker? **Yes.** What kind of employee was she? **She actually does a great job in her work when she work.** Say that again? **The problem is when she work, the problem was getting her to stay at her desk, not on the cell phone outside for 20, 30, 40 minutes.** |
| 24 | 2 | To get our timeline right, you were sworn in December of 2015, right? **Yes, sir. Yes, ma'am. Yes, sir.** You worked in December and January of 2015 and you took leave for your brain surgery in February 2016, right? **No sir, that not correct. I worked as a tax collector/assessor starting January.** Were you sworn in in January of 2016? **No sir. I was sworn in in December.** You started working January 2016. **There you go.** Took leave in February 2016? **Yes sir.** Returned in April 2016? **I think that is correct.** When you got back to work in April of 2016, was Valerie still not working hard enough? **After, she got worse.** She got worse? **Uh-huh.** |
| 26 | 1 | **I had meetings and told them what they could and could not do.** We are going to talk about some of that. My question is a little bit different for now. **Okay.** Did Valerie Harris ever receive a write-up? **No, sir.** How many times did you complain to Valerie Harris about her not working hard enough? **I don't remember, but I did call to talk to her about it.** Called on the telephone? **No, sir. I talked to her in the office about it.** |
| 26 | 18 | Is that just one-on-one you and her? **That's correct.** How many times did you do that? **Maybe once or twice. I'm not sure.** Did her performance get better? **Actually after the second time I talked to her and what I had discussed with her, once I left the office, she did just what I told her not to do.** |

27    2    Explain that.  What had you told her not to do?  **I told her, This conversation is between you and I.  Don't say anything to anyone else about it.  She said that Johnnie - - you know, I told her that Johnnie had told her to do something and she wouldn't do it.  And that's what I was talking to her about.  But once Johnnie came back in the office and I left out, I went back around the corner and she and Johnnie was having a conversation about that.  I went in and I told her, I said, You can do what Johnnie say do or you came to me.  And if I say do it - - if you can't do what either one of us tell you, you need to hit the door.  You need to leave.  So she stayed.**  She stayed on that occasion?  **Uh-huh.**  What is Johnnie's last name?  **Griffin.**  What is his position?  **It's a her.**

In *Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court set forth a three-prong test that a plaintiff must satisfy to prevail on a First Amendment retaliation claim.  That test provides that: (1) a plaintiff must first show that his speech was on a matter of public concern; (2) he must prove that his speech was a "substantial or motivating factor in the termination;" and (3) the defendant can escape liability by showing that it would have taken the same action even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. 568. *Gerhart v. Hayes*, 217 F.3d 320, 321 (5th Cir. 2000).

Here, Ms. Robinson testified Ms. Harris had a poor work ethic and was insubordinate; as such, Ms. Harris could have been terminated regardless of the Confidentiality Agreement issue.  In her deposition, Ms. Robinson cited Plaintiff Harris using work time for personal calls and doing the exact opposite of what was requested of her.

Because Ms. Robinson had grounds to terminate Ms. Harris and would have terminated her regardless of the Confidentiality Agreement, summary judgment is appropriate.

**Conclusion**

Valerie Harris admits the speech she is concerned with in this lawsuit would all be speech made as a part of her official duties; as such, she is afforded no First Amendment protection. Further, the "speech" is not a matter of public concern and she is a confidential employee under the *Pickering* balancing test. For these additional reasons, summary judgment is warranted for Noxubee County and Betty Robinson.

**JACKS| GRIFFITH| LUCIANO, P.A.**

By:    /s/ ***Jamie F. Jacks***_____
        Jamie F. Jacks
        MS Bar No. 101881
        Attorney for Defendants, Noxubee County,
        Mississippi and Betty S. Robinson

Of Counsel:
**JACKS| GRIFFITH| LUCIANO, P.A.**
150 North Sharpe Street
P. O. Box 1209
Cleveland, MS 38732
Phone No. 662-843-6171
FAX No. 662-843-6176
Email: jjacks@jlpalaw.com

**CERTIFICATE OF SERVICE**

I, Jamie F. Jacks, attorney of record for Defendants, Noxubee County, Mississippi and Betty S. Robinson do hereby certify that I have this day caused a true and correct copy of the above and foregoing *Memorandum Brief in Support of Motion for Summary Judgment* to be delivered by the ECF Filing System and U.S. Mail which gave notice to the following:

        Jim Waide, Esq.
        Waide & Associates, P.A.
        P.O. Box 1357
        Tupelo, MS 38802-1357
        Phone: (662) 842-7324
        Fax: (662) 842-8056
        Email: waide@waidelaw.com
        **Attorney for Plaintiff**

R. Shane McLaughlin
McLaughlin Law Firm
338 North Spring Street, Ste. 2
Tupelo, MS 38804
P.O. Box 200
Tupelo, MS 38802-0200
Phone: (662) 840-5042
Fax: (662) 840-5043
Email: rsm@mclaughlinlawfirm.com
**Attorney for Plaintiff**

**DATED** this 1st day of June, 2018.

/s/*Jamie F. Jacks*
Jamie F. Jacks